## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | Criminal No. 3:16cr124(SRU) |
| JAMES C. DUCKETT JR. | : | November 10, 2017 |

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in aid of sentencing and in response to the defendant's sentencing memorandum dated November 9, 2017 (Doc. 189).  The defendant, James C. Duckett Jr., is scheduled to be sentenced on November 17, 2017.

In July, a jury convicted Mr. Duckett for defrauding the City of Hartford and others in connection with the renovation of Dillon Stadium.  Mr. Duckett's crimes cost the City of Hartford and a local architecture firm hundreds of thousands of dollars and caused the entire project to implode.  Based upon the seriousness of the offense, including the harm caused to the victims, Mr. Duckett's utter lack of respect for the law, and Mr. Duckett's ongoing lack of candor, the Government respectfully asks that the Court impose a Guidelines sentence of 60 months of imprisonment.

## I.   THE OFFENSE AND RELEVANT CONDUCT

The Court is familiar with this case and the evidence offered at trial.  This evidence is fairly summarized as follows:

Mitchell Anderson, was the President of Premier Sports Management Group LLC ("PSMG") and James Duckett was the Chief Executive Officer of Black Diamond Consulting Group ("Black Diamond.")

In September of 2014, Anderson, on behalf of PSMG, entered into a professional services contract with the City of Hartford, Connecticut, for the redevelopment of the Dillon Stadium and Colt Park venues.  At that time, Dillon Stadium was a multi-use facility owned by the City primarily used by student and semi-professional teams for football and soccer activities.  Adjacent to Dillon Stadium was Colt Park, an approximately 100-acre public facility with outdoor pools, playscapes, basketball courts, baseball and softball fields, and open fields.

Under the terms of the professional services contract, PSMG agreed to serve as the project manager for the redevelopment of Dillon Stadium and Colt Park, to oversee the design/bid/build process for a new stadium at the site, and to secure a professional soccer team franchise to be based at the new stadium.  The City allocated $12 million total for the project, which included $775,000 in management fees for PSMG.

PSMG retained sub-contractors to perform the preliminary design and environmental work for the site preparation of the new stadium.  These sub-contractors submitted invoices for their work directly to PSMG.  PSMG, in turn, prepared a single, PSMG invoice to the City's Development Services Department, reflecting  the sum of the sub-contractors' individual invoices along with PSMG's 5% management fee.  From September of 2014 through April of 2015, Anderson e-mailed

the PSMG invoice, together with the supporting sub-contractor invoice(s) backup to the Development Services Department.  After processing by the City, the City's Treasurer's Office then issued a check to PSMG, which check was sent by the United States Postal Service.  PSMG was then, in turn, responsible for paying its sub-contractors.

From the fall of 2014 through the winter of 2015, Anderson and PSMG worked to secure an ownership group for a North American Soccer League ("NASL") franchise to play at Dillon Stadium.  The NASL had certain threshold financial requirements for prospective majority owners, including a net worth of at least $25 million and required detailed financial information to verify a potential owner's wealth.   In February of 2015, Anderson and Tom Novajasky of PSMG were introduced to James Duckett at Duckett's home in Somers, Connecticut as a potential majority owner for the NASL team.  Mr. Duckett told Anderson and Novajasky that he was a former professional football player and that his company, Black Diamond, was involved in other development projects including one with Foxwoods Casino.

In March of 2015, Anderson introduced Mr. Duckett to officials from the City as the potential majority owner for the professional soccer team.  At a meeting in the Mayor's Green Room in late March of 2015 (and in subsequent communications with City officials), Mr. Duckett represented that he and his company, Black Diamond, had the financial means not only to fund the NASL franchise but also to privately finance the construction of the new Dillon Stadium itself.  Mr. Duckett stated that he had formerly played in the NFL and that he was involved in building a new athletic

"bubble dome" at Foxwoods Casino.  Mr. Duckett requested that the City simply deliver a "flat piece of land" upon which the stadium would be built.  Shortly after this meeting, Anderson and Duckett began telling officials from the City and others that PSMG and Black Diamond were merging and, in fact, had merged.  The City initiated plans to enter into a land-lease agreement with Duckett and his attorney for the City-owned land upon which the stadium would be built.  The City was completely unaware that Duckett did not, in fact, play in the NFL, that Foxwoods had declined to do any projects with Duckett, and that Duckett had no access to any significant financial resources.  Instead, Duckett was in the process of being evicted from the house he rented in Somers, had no money in his bank accounts, and had several pending civil suits against him for unpaid utilities and the like.

Beginning in or about February of 2015, Anderson and Duckett began a scheme to defraud the City and PSMG's sub-contractors by submitting PSMG invoices to the City of Hartford for reimbursement of amounts that were due and owing to PSMG's sub-contractors but which monies Anderson and Duckett intended to and did keep for themselves and/or directed the monies to third parties unrelated to the Dillon Stadium project.

For example, on March 16, 2015, PSMG received a check from the City for $321,404.31 for PSMG invoice #105, monies that were intended to pay the architects and engineers working on the Dillon Stadium project.  Rather than pay these subcontractors, Anderson and Duckett instead agreed that Anderson would send $200,000 of these funds to Attorney Deron Freeman's IOLTA account.  Freeman was

a friend of Mr. Duckett's.  According to Anderson, he believed that the funds would be held in escrow and were necessary for Black Diamond to provide its funding for the stadium construction.  However, once the funds were received by Freeman, he disbursed the funds at Duckett's direction.  These disbursements included a $119,990 payment for the purchase of a luxury Land Rover for Duckett; two payments totaling $11,000 to Freeman for the repayment of a loan and for legal services in connection with Duckett's lawsuit involving a dispute with his neighbor; and cash disbursements to Duckett, his girlfriend, and two of his friends.  See Gov't Ex. 11A.

The diversion of City funds from PSMG's subcontractors to Anderson and continued from March of 2015 through October of 2015.  For example, on April 6, 2015, Anderson wrote a check for $20,000 to Anthony Camilleri, the individual who introduced him to Duckett.  On May 19, 2015, Anderson wired $50,000 at Duckett's direction to Moolex Capital, a purported investment "platform" associated with Duckett.  On May 20, 2015, Anderson transferred $40,000 from PMSG's operating account to Black Diamond's account.

Anderson and Duckett did not tell the City or PSMG's subcontractors that the City's funds were being diverted from PSMG's sub-contractors to Duckett.  To the contrary, Anderson, and others at his direction, informed PSMG's sub-contractors that the City's funds had not yet been received or were in "escrow" and that the sub-contractors would be paid shortly.  Anderson and two of his employees, Tom Novajasky and Eddie Davidson, discussed the fact that PSMG sub-contractors had

not been paid with Duckett, who repeatedly assured them that he would soon have cash to put back into PSMG.  Duckett never made any such deposits.

In addition, beginning in July of 2015, Anderson and Duckett submitted three artificially-inflated and fraudulent PSMG invoices to the City based upon invoices from Big Span Structures in Florida, which Anderson and Duckett falsely represented had done work on behalf of the Dillon Stadium project.  In fact, an employee of Big Span, Rick Laxton, had done $50,000 of work for Duckett on an unrelated project, but Big Span had not been hired to do work on the Dillon Stadium matter nor sold any of its products to the City, PSMG or Black Diamond for use on the Dillon Stadium project.  Instead, Laxton emailed the three Big Span invoices (in the amounts of $450,000, $250,000 and $300,000, respectively) from Florida to Duckett and Anderson in Connecticut as a means to trigger a conversation with the City about purchasing Big Span's products.  The fraudulent PSMG invoices that contained the Big Span invoices were then hand-delivered by Duckett to the City and included PSMG's 5% fee on top of the amounts of the Big Span invoices.  The City paid the first two invoices but was able to stop payment on the third invoice when news of Duckett's criminal record surfaced in the press on October 5, 2015.

Anderson and Duckett used the City's funds related to the fraudulent Big Span invoices for personal items not related to the Dillon Stadium project, including: an August 4, 2015 transfer of $120,000 to Black Diamond; a $16,770 payment to Premier Soccer, Anderson's company related to indoor soccer;  a $40,000 wire and a $12,000 wire to Derek Edwards, an associate of Duckett's; a $13,252.64 payment to Duckett's

credit card company; a $58,000 payment to an indoor soccer league associated with Anderson; $20,000 in cash; a $50,000 payment to Rick Laxton; an August 26, 2015 transfer of $15,000 to Black Diamond; a September 2, 2015 transfer of $105,000 to Black Diamond; and a $36,800 payment to an artificial turf company related to Anderson's indoor soccer league.

Bank records show that the transfers to Black Diamond's accounts were used by Duckett for personal items, including over $90,000 in cash withdrawals, thousands of dollars at high-end clothing retailers like Nordstrom, Gucci and Ferragamo, and thousands of dollars on hotels, travel and restaurants.

In an effort to conceal their ongoing fraud, Anderson and Duckett made misrepresentations about PSMG's performance of its contract to officials from the City, including that PSMG and Black Diamond were ready to announce the NASL soccer franchise and that Black Diamond had ample funding to construct the new stadium.  On October 1, 2015, Duckett repeated these statements at a video-recorded meeting of the City Council's Operations, Management and Budget committee meeting.  Duckett also passed around a letter from "Invest Technical Services" that falsely stated that Black Diamond had secured $440 in funding from "Barclay's Bank London."  Duckett stated that Derek Edwards, the signatory on the letter, was a "board member" of Barclays.  In fact, as Anderson and Duckett knew, the NASL had never received the required financial information from Duckett and the NASL had ceased discussions with Duckett and Anderson by mid-May of 2015 concerning a franchise for Hartford.  Moreover, as Duckett knew, he had no sources of funding for

the Dillon Stadium project as he had no legitimate income sources, was the subject of eviction proceedings, owed hundreds of thousands of dollars in loans and civil judgments, and was essentially bankrupt but for the money coming to him as a result of the fraud.  In addition, Duckett knew that Derek Edwards was not a board member of Barclay's Bank but was an associate of his that lived in Florida.  Indeed, Barclays Bank confirmed that the information contained in the letter passed around at the October 1st City council meeting was false—i.e., that neither Duckett nor Edwards had any financial accounts with the bank.

In addition, Duckett engaged in several monetary transactions through Santander Bank, a financial institution whose deposits are insured by the FDIC, in property derived from the illegal scheme:[1]

| Date | Monetary Transaction | Defendant(s) |
|------|---------------------|--------------|
| 3/30/2015 | Check # 1005 from PSMG construction account (ending in 3713) at Santander Bank in the amount of $200,000 to Attorney Deron Freeman | ANDERSON DUCKETT |
| 5/19/2015 | Wire from PSMG operating account (3063) in the amount of $50,000 to Moolex | ANDERSON DUCKETT |
| 5/20/2015 | Transfer from PSMG operating account (3063) at Santander Bank in the amount of $40,000 to Black Diamond account (ending in 9025) at Santander Bank | ANDERSON DUCKETT |
| 8/4/2015 | Transfer from PSMG operating account (3063) at Santander Bank in the amount of $120,000 to Black Diamond account (9025) at Santander Bank | ANDERSON DUCKETT |

---

[1] Mr. Duckett is not being held "responsible" for the monetary transactions solely attributable to Mr. Anderson, as he claims.  *See* Def. Sent. Memo. at 4, 11-12. In terms of the 18 U.S.C. §1957 counts of conviction, their role in the Guidelines calculation is simply the addition of a single point under U.S.S.G. §2S1.1(b)(2)(A).

| Date | Monetary Transaction | Defendant(s) |
|---|---|---|
| 8/5/2015 | Wire from Black Diamond account (9025) at Santander Bank in the amount of $40,000 to Derek Edwards | DUCKETT |
| 8/5/2015 | Check #103 from Black Diamond account (9025) in the amount of $13,252.64 to Capital One for an account associated with DUCKETT | DUCKETT |
| 8/26/2015 | Transfer from PSMG operating account (3063) at Santander Bank in the amount of $15,000 to Black Diamond account (9025) at Santander Bank | ANDERSON DUCKETT |
| 9/2/2015 | Transfer from PSMG operating account (3063) at Santander Bank in the amount of $105,000 to Black Diamond account (9025) at Santander Bank | ANDERSON DUCKETT |

In terms of restitution, the undersigned has received the following information from the victims of the offense:

The City of Hartford is owed $814,287.18, which represents the difference in the amount paid by the City ($1,851,823.64) minus the amounts legitimately paid over to the vendors ($497,141.27 to Quisenberry Arcari; $45,087.00 to Fuss & O'Neill and $175,000 to PSMG as its retainer fee).[2] The City also has incurred attorneys fees in the amount of $205,266.13 spent in connection with their investigation of the fraud. This totals $1,019,553.31. The City has recovered $350,000 from its insurer,

---

[2] Mr. Duckett is not being held responsible for the $175,000 payment to PSMG. *See* Def. Br. at 4. There is an error in co-defendant Mitchell Anderson's plea agreement that attributes restitution to the city as $774,266.18. This number was calculated before it was discovered that PSMG had doubled-billed the City for a Fuss & O'Neill invoice in the amount of $40,021. Thus, that amount should not go to Fuss & O'Neill but to the City for the total of $814,287.18.

Bruen, Deldin, DiDio Associates and the Government asks that this portion of the restitution order be directed to the insurer. *See* 18 U.S.C. § 3664(j)(1).

Quisenberry Arcari is owed $320,356.44, which represents the total of its past-due invoices. In addition, Quisenberry Arcari has suffered out-of-pocket expenses in the amount of $81,000 for work in progress performed under their contract with PSMG, but which was never billed to PSMG/the City because of the implosion of the project. Finally, Quisenberry Arcari incurred $20,000 in attorneys fees in their investigation of the fraud. This totals <u>$421,356.44</u>.

## II.   <u>THE PRE-SENTENCE REPORT AND GUIDELINES CALCULATION</u>

The Government concurs with the Guidelines calculation set forth in the Pre-Sentence Report.

The defendant's base offense level is 7 under U.S.S.G. § 2B1.1(a)(1). 14 levels are added because the loss was greater than $500,000. *See* U.S.S.G. § 2B1.1(b)(1)(H).[3] Two levels are added because the defendant used sophisticated means in the scheme, including the use of his attorney's IOLTA account to disguise payments to him and fraudulent bank documents. *See* U.S.S.G. §2B1.1(b)(10)(C). This results in an offense level of 23.

---

[3] This calculation is supported by a number of alternate calculations-- the actual loss to the City of the difference between the amount it paid out versus the amounts legitimately paid over to PSMG vendors ($1,354,682.37), the intended loss of just the three submitted Big Span invoices ($700,000), and the actual gain to Duckett ($644,000).

One level is added pursuant to U.S.S.G. §2S1.1(b)(2)(A) because the defendant was convicted under 18 U.S.C. §1957, resulting in a total offense level of 24.

The defendant is in criminal history category I but does have three prior criminal convictions for voyeurism, embezzlement, and assault inflicting serious injury. *See* PSR ¶ ¶ 42-45.

With a total offense level of 24, and a Criminal History Category of I, the advisory Guidelines range is 57 to 71 months of imprisonment.   The defendant also faces an advisory range of one to three years of supervised release. *See* U.S.S.G. § 5D1.2(a)(2).

## III.   <u>DISCUSSION</u>

After the Supreme Court's holding in *United States v. Booker*, 543 U.S. 220, 243-245 (2005) rendered the Sentencing Guidelines advisory rather than mandatory, a sentencing judge is required to: "(1) calculate[] the relevant Guidelines range, including any applicable departure under the Guidelines system; (2) consider[] the Guidelines range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence." *See United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir.), cert. denied, 127 S. Ct. 192 (2006); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). The § 3553(a) factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant"; (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the

defendant, and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) the kinds of sentences available; (4) the sentencing range set forth in the guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims.  *See* 18 U.S.C. § 3553(a).

The Second Circuit reviews a sentence for reasonableness.  *See Rita v. United States*, 127 S. Ct. 2456, 2459 (2007). The reasonableness standard is deferential and focuses "primarily on the sentencing court's compliance with its statutory obligation to consider the factors detailed in 18 U.S.C. § 3553(a)."  *United States v. Canova*, 412 F.3d 331, 350 (2d Cir. 2005).

The Government respectfully requests that a term of imprisonment of 60 months be imposed in light of all of the section 3553(a) factors.

## A. The Nature and Circumstances of the Offense Are Serious

First, the nature and circumstances of the offense are serious and demand an equally serious punishment.  Mr. Duckett and Mr. Anderson stole money from the City of Hartford for their own personal benefit.  Rather than use the City's funds to revitalize a city landmark, Mr. Duckett spent hundreds of thousands of dollars on himself.  The indictment speaks in terms of "fraud," but in reality Mr. Duckett's crimes were just an outright theft, used to support his taste for luxury cars, expensive clothes, travel, and restaurants.  The brazen nature of the thefts is simply astounding: while, on the one hand Mr. Duckett was making false promises of a NASL

franchise and secured private financing to the City he was, in reality, indulging on personal shopping sprees with the City's money.  Hartford, as Mr. Duckett well knew, was not a city that could stand to lose any money, much less the hundreds of thousands of dollars stolen by Mr. Duckett.  In its letter to the Court, Corporation Counsel writes, "the amounts stolen by Mr. Duckett cannot simply be re-appropriated from elsewhere in the City budget."

Mr. Duckett and Mr. Anderson did not just steal from the City, however.  They stole from the Quisenberry Arcari firm, a small, local architecture firm that was hired for the Dillon Stadium redesign.  David Quisenberry testified at trial the financial toll the crime took on his small firm—believing that the City was the source of the delay in being paid, the company fronted its own money to its vendors to keep the Dillon Stadium project moving forward.  His company is now out over $400,000 in unpaid invoices and for work performed.

Aside from the financial loss, Mr. Duckett and Anderson's crimes caused significant damage to the City of Hartford and its supporters.  The City and the soccer community at large were thrilled at the prospect of revitalizing a landmark, once home to semi-professional teams and a venue for historic rock concerts.  As the City explains, it "envisioned bringing life back to this stadium . . . and saw this as a catalyst for economic growth."  Instead, two years later, the venue remains in a state of disrepair.  The City explains:

> Mr. Duckett's actions caused reputational harm to the City.  His duplicity tarnished the trust that the City needs to maintain with its citizens.  The public was told that Dillon Stadium would be revitalized

and that Hartford schools, which have events at that stadium, would have a new and improved venue. The mistrust caused by Mr. Duckett's actions is not something that can be quantified, but a sentence commensurate with the gravity of Mr. Duckett's crimes will go a long way toward assuring residents that those who violate the law and steal from the City will be held accountable.

Mr. Quisenberry echoes these sentiments and explains that the "entire event has been extremely painful to our company" and that Mr. Duckett's actions "derailed a promising project and caused long lasting damage to my business. I see no way that damage can be undone . . . ."[4]

## B. Mr. Duckett's History and Characteristics Are Troubling

The history and characteristics of Mr. Duckett also warrant a substantial sentence. Throughout the charged scheme, Mr. Duckett regularly misrepresented, lied, exaggerated, and deflected. Undoubtedly, he showed charisma, enthusiasm and confidence, but all while masking his best ability—to hide the truth. For example, in his presentation to the Hartford City Council on October 1, 2015 (Gov't Ex. 6A), he spoke at length with ease and grace about the "years I've been taking care of kids, supporting youth sports foundations," the "machine" that he had methodically built for the Hartford NASL team, and the "pride" he intended to return to Hartford. He stated that Hartford "was just one of the many projects" that he was working on with his $440 million in financing, in addition to "projects in Vegas, projects in Atlanta."

---

[4] Both victims also note the collateral damage caused by Duckett and Anderson's scheme—the time employees spent responding to the collapse of the project, the lost revenue associated with completing the project and having a usable, renovated stadium, and the time spent responding to subpoenas, assisting in the investigation, and participating at trial.

Those in attendance at the meeting had every reason to be impressed with Mr. Duckett and to believe what he was saying. They had no idea that Mr. Duckett and Anderson had already diverted hundreds of thousands of dollars from the project, including over a half-million of dollars to Mr. Duckett personally. They had no reason to suspect or that his only source of income was the money he had stolen from the City.[5]

Mr. Duckett's struggles to tell the truth have continued in this prosecution. The Pretrial Services Officer sought a warrant for Mr. Duckett's arrest when he deliberately hid the fact that he had been evicted from his house in Somers, Connecticut, and had been travelling out of the district without permission. *See* PSR ¶6. He has not verified any legitimate employment, *see* PSR ¶ ¶ 7, 89, but instead has vaguely stated that he is "living off loans and investments." PSR ¶85. The Government has uncovered two instances where Mr. Duckett used others as straws in an apparent attempt to thwart the significant restitution order he faces. First, Mr. Duckett had a N.M. of Peabody, Massachusetts purchase a Cadillac Escalade for him but put it in her name. *See* PSR ¶ 6. Second, after being convicted by the jury, Mr. Duckett had a woman named R.R. in California open a bank account for him. R.R.

---

[5] Anderson and Duckett were aware that the a *Hartford Courant* story about Mr. Duckett's criminal past would be appearing online on October 6, 2015 because the newspaper had previously called Mr. Duckett for comment. Rather than use that as an opportunity to begin to make things right with the City, Mr. Duckett spent the day before the story broke in Boston, spending $476 at a Thomas Pink men's store, $2,600 at Cartier, $547 at Optica, and $479 at Nordstrom. The day the story appeared online, Mr. Duckett spent $795 online at Burberry. *See* Gov't Ex. 102.

stated that $15,000 had been deposited into that account from a "Richard" in Florida, and that Mr. Duckett had the debit card associated with that account, and was controlling the account. *See* Doc. 185. Rather than demonstrate any concern whatsoever for the people he stole from, Mr. Duckett instead appears determined to put his own interests first.[6]

Mr. Duckett's lack of candor is apparent throughout the Pre-Sentence Report. As the report concludes, Mr. Duckett "appears to have no problem exaggerating/ embellishing his life history for his own benefit." PSR ¶ 117; *see also* ¶59 ("he accepted a scouting job with the Redskins football team[.]"); PSR ¶62 ("He reported that he started his own sports consulting business and traveled around preparing athletes 'for the pros.'"); PSR ¶ 62 ("Mr. Duckett reported that he played semi-professional football and had owned one of the teams[.]"); PSR ¶86 ("[H]e had been working on a deal with Foxwoods . . . [but] he did not want to go any further with the project when he became involved in the instant offense" when, in fact, Foxwoods told Mr. Duckett in 2015 that it would not be doing business with him); PSR ¶87 (identifying 110 Long Hill Drive as a property that he "flipped" with a friend, when in fact he was evicted from the property by its owner).

While Mr. Duckett has provided some vague accounts of his background, there is little documented evidence of any record of employment or legitimate business transactions. Indeed, the information that Mr. Duckett has provided is demonstrably

---

[6] As of the filing of this memorandum, the Government had not yet received Mr. Duckett's financial statement.

false.  For example, Mr. Duckett reported to the Court that he was working on a "large project in Las Vegas" in connection with the Oakland Raiders team move to Las Vegas.  He reported that he had secured "outside funders in Europe" for the deal, and that he intended to use the money from the project "to pay back the City of Hartford and donate to children."  PSR ¶82.  In reality, however, the Oakland Raiders confirmed that a representative of the team met with Mr. Duckett in 2016 but learned that Mr. Duckett lied about owning a piece of property in Las Vegas. The team then "contacted Mr. Duckett directly to terminate all communication going forward."  PSR ¶83.[7]

## C. There Was No Good Faith Reliance By Mr. Duckett On Others

Mr. Duckett seeks to minimize his own wrongdoing by suggesting that he believed in good faith that the company known as Moolex was going to come through with financing for the stadium deal. Def. Br. at 5, 7.  This argument is flawed for two reasons: first, Mr. Duckett had already taken and spent $200,000 in City/ subcontractor funds in March of 2015 before he directed Anderson to send $50,000 to Moolex in May of 2015.[8]  Second, when it became obvious that money from Moolex

---

[7] It has been widely report that in May of 2017, the Raiders closed on the purchase of 62 acres of property intended for the new stadium site.  *See* https://www.reviewjournal.com/sports/raiders-nfl/raiders-close-purchase-on-62-acre-stadium-site-in-las-vegas/.

[8] Mr. Duckett argues that he believed in Moolex such that "he put money into it," Def. Br. at 7, but there is no evidence that Mr. Duckett put any of his *own* money in Moolex, instead he had Anderson send City/ subcontractor money from PSMG to Moolex.  In addition, while Mr. Duckett's exact role in Moolex remains ambiguous, he certainly held himself out to be part of Moolex.  It is hard, therefore, to see Mr. Duckett as any sort of victim with respect to this entity.

was not coming, Mr. Duckett simply devised a new fraud and began submitting the fake Big Span invoices to the City instead.

Similarly, Mr. Duckett's attempts to blame others for is criminal conduct falls flat. *See* Def. Br. at 5-7. Undoubtedly, his co-conspirator Mitchell Anderson is equally to blame for his own role in the conspiracy. Nevertheless, Mr. Anderson has pleaded guilty and will be sentenced by the Court for his criminal conduct. Mr. Anderson's criminal conduct does not excuse Mr. Duckett's own criminal wrongdoing.

Mr. Duckett's attempts to blame Thomas Novajasky are, in the Government's view, offensive. There is no evidence that Mr. Novajasky was involved with embezzling funds from the City, that Mr. Novajasky was aware that fake Big Span invoices were submitted by Mr. Duckett and Mr. Anderson to Hartford, or that Mr. Novajasky benefitted financially from this scheme. To the contrary, when Mr. Novajasky became concerned that subcontractors were not being paid, he sought the advice of an attorney as to what he should do. Mr. Duckett's attempts to deflect blame on Mr. Novajasky have no basis in the facts of this case and do not constitute a basis for a more lenient sentence.

Likewise, the Court should reject Mr. Duckett's attempts to blame the City of Hartford for the stadium fiasco. Mr. Duckett claims that the City is attempting to "hide its failure to in any way monitor Mr. Anderson[,]" Def. Br. at 11, while he ignores the fact that the City relied upon the false statements of Mr. Duckett. This is not a case about the simply failure to "monitor" someone; this is a case where two individuals criminally lied and deceived the City with their words and actions.

### D.    A Sentence of 60 Months Promotes Respect for the Law, Provides Just Punishment and Will Deter Others

A sentence of 60 months of imprisonment appropriately promotes respect for the law and provides just punishment. A substantial sentence sends the message to Mr. Duckett's victims and the public that stealing from taxpayers and stealing from a local small business is a serious crime with significant consequences. Mr. Duckett's actions cost taxpayers money and caused the collapse of a project aimed at creating a safe recreational space for the Hartford community. A sentence of 60 months also reflects the fact that Mr. Duckett's conduct was not a one-time single mistake, or a discrete course of action. Instead, Mr. Duckett and Mr. Anderson schemed for several months, stole hundreds of thousands of dollars, submitted knowingly false and fraudulent invoices and bank documents to the City, and made a series of representations about the stadium project and the NASL. Indeed, as the bank records make clear, the money stolen from the victims was Mr. Duckett's sole source of income. He did not make a single, isolated mistake but engaged in a deliberate course of action over a significant period.

Next, a Guidelines sentence of 60 months accomplishes the goal of general deterrence by sending the clear and unequivocal message that the justice system does not tolerate fraud and theft from local governments and small businesses. As with many small cities, Hartford operates with limited financial resources. Cities need the assurance that its business partners will be honest and that criminal self-dealing will be severely punished.

19

Finally, it is clear that Mr. Duckett does not recognize the wrong that he has done and the significant harm that he has caused. His takeaways from this case are that he should have been more "diligent" with Mr. Anderson and that his trust in Moolex was "misplaced." Def. Br. at 12. Mr. Duckett attempts to mitigate his actions by explaining that he is "guilty of not paying attention," *see* PSR ¶ 28, and utterly fails to appreciate the harm he caused. His statement that "people do not understand the high level of clientele that he was dealing with[.]" suggests that he still believes that his actions—and the hundreds of thousands of dollars he spent on himself—were justified. *See* PSR ¶28. This is troubling. The sentence imposed must deter Mr. Duckett from continuing with his fraudulent, criminal conduct.

### E.   A Downward Departure Is Not Appropriate

To the extent that Mr. Duckett may seek a downward departure on the basis of his medical condition, the Government does not understand his current condition to constitute "an extraordinary physical impairment" under U.S.S.G. §5H1.4. Mr. Duckett's personal physician explained that Mr. Duckett's condition is stable and treatable,[9] and that the Bureau of Prisons will be able to provide appropriate care to Mr. Duckett.

---

[9] Indeed, Mr. Duckett has been well enough that he has asked permission to travel out of state to Maryland and Florida.

## IV.    **CONCLUSION**

Thus, for the reasons set forth above, and based upon the facts currently before the Court, the Government respectfully submits that the Court impose a Guidelines sentence of 60 months of imprisonment, a term of supervised release of three years, and full restitution to the victims of Mr. Duckett's offense.

In light of the fact that Mr. Duckett has not been forthcoming with his finances, has no verifiable employment, has misstated his involvement in a Las Vegas project, and has recently used others to funnel thousands of dollars to himself personally, the Government respectfully requests that the Court consider detaining Mr. Duckett following sentencing pursuant to 18 U.S.C. §3143(a).

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

/s/
Sarah P. Karwan
Federal Bar No. ct22911
Douglas P. Morabito
ASSISTANT U.S. ATTORNEYS
157 Church Street, 23rd Floor
New Haven, CT  06510
Tel.: (203) 821-3700
Fax: (203) 773-5376
sarah.p.karwan@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2017 a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/

SARAH P. KARWAN
ASSISTANT UNITED STATES ATTORNEY