## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

JAMES C. DUCKETT, JR.

No. 3:16-cr-124 (SRU)

## RULING ON MOTION FOR JUDGMENT OF ACQUITTAL (#147)
## AND MOTION FOR A NEW TRIAL (#148)

On July 6, 2017, a jury convicted James C. Duckett, Jr. of one count of conspiracy to commit mail or wire fraud in violation of 18 U.S.C. § 1349, three counts of wire fraud in violation of 18 U.S.C. §§ 2 and 1343, and eight counts of illegal monetary transactions in violation of 18 U.S.C. § 1957.

Duckett filed a Motion for Judgment of Acquittal (doc. # 147) in which he argues that, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, I should issue a judgment of acquittal because the evidence presented at trial was insufficient to sustain a finding of guilt beyond a reasonable doubt on all counts of conviction.  Specifically, Duckett argues that the government's case substantially relied upon the testimony of Duckett's indicted co-defendant and co-conspirator, Mitchell Anderson, and the jury erred in crediting that testimony.

Duckett also filed a motion for a Motion for a New Trial (doc. # 148) in which he argues that, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, I should order a new trial because he was prejudiced by (1) admission of bad act evidence and (2) an error in the jury instructions.

For the following reasons, Duckett's Motion for Judgment of Acquittal (#147) and Motion for a New Trial (#148) are **denied**.

## I.      Background

The facts and circumstances of the case arise out of a conspiracy between Duckett and Anderson to defraud the City of Hartford ("the City") in connection with its project to redevelop a soccer stadium in the City.  Anderson, on behalf on his company Premier Sports Management Group LLC ("PSMG"), entered into a contract with the City in which PSMG agreed to redevelop Dillon Stadium, construct a new multi-purpose athletic field in Colt Park, and find a professional soccer team franchise to be based in the Stadium.  Duckett, on behalf of his company Black Diamond Consulting Group ("Black Diamond"), became a part of Anderson's project as a potential majority owner for the soccer team that was to be brought to the City.  Duckett represented to Anderson and the City that he and his company had the financial resources to fund both the team and the Dillon Stadium construction.

PSMG, which later purported to merge with Black Diamond, retained subcontractors to perform the work on the Dillon Stadium project.  The subcontractors submitted invoices to PSMG, which would then invoice the City and add a 5% management fee, consistent with the terms of the contract.  The City would then issue a check to PSMG in payment of the invoices for PSMG to disperse to the subcontractors.  Beginning in February 2015, Anderson and Duckett wrongfully retained some of the funds issued by the City rather than paying the entire invoice amount to the subcontractors.  Additionally, Anderson and Duckett received proposals from a Florida design firm, Big Span Structures ("Big Span"), which included the estimated cost of their services on the project and/or invoices for projects unrelated to Dillon Stadium, which Anderson and Duckett falsely submitted as invoices to the City and retained those funds.

On July 6, 2017, the jury found Duckett guilty of one count of conspiracy to commit wire fraud, three counts of wire fraud, and seven counts of illegal monetary transactions.  He filed the motions at issue here on August 21, 2017.

II.     **Motion for Judgment of Acquittal (#147)**

A.   <u>Standard</u>

Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. "A defendant seeking to overturn a conviction on the ground that the evidence was insufficient bears a heavy burden." *United States v. Best*, 219 F.3d 192, 200 (2d Cir. 2000), *cert. denied*, 121 S. Ct. 1733 (2001). The reviewing court must view the evidence in the light most favorable to the prosecution and must reject the sufficiency challenge if it concludes that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). *See also United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998) ("[t]he ultimate question is not whether [the court believes] the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but whether *any rational trier of fact could so find*" [emphasis in original.]).

A reviewing court must consider the evidence as a whole, not in isolation, and must defer to the jury's determination of the weight of the evidence, credibility of witnesses, and competing inferences that can be drawn from the evidence. *Best*, 219 F.3d at 200. The district court must "assum[e] that the jury resolved all questions of witness credibility and competing inferences in favor of the prosecution." *United States v. Abu–Jihaad*, 630 F.3d 102, 134 (2d Cir. 2010) (internal citations omitted); *see also United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998) ("We defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of competing inferences that can be drawn from the evidence."). The jury is "exclusively responsible" for determinations of witness credibility; *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993); and the court must be "careful to

avoid usurping the role of the jury since Rule 29 does not provide the trial court with an opportunity to substitute its determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) (internal quotation marks omitted).  The court should defer to the jury's credibility assessments and intrude upon that function only where "exceptional circumstances can be demonstrated" such as when "testimony is patently incredible or defies physical realities." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).

B. <u>Discussion</u>

1. *Conspiracy to Commit Mail or Wire Fraud (Count 1)*

Duckett was charged in Count One with conspiracy to commit mail or wire fraud in violation of 18 U.S.C. § 1349, which provides:  "Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

In order to convict a defendant of criminal conspiracy, "the Government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent." *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010).  "The gist of a conspiracy is an agreement between two or more participants to achieve a particular illegal end." *United States v. Santos*, 541 F.3d 63, 71 (2d Cir. 2008).  "The Government's proof of an agreement does not require evidence of a formal or express agreement; it is enough that the parties have a tacit understanding to carry out the prohibited conduct." *United States v. Nusraty*, 867 F.2d 759, 763 (2d Cir. 1989) (internal quotation marks omitted).  The evidence must permit a rational jury to find the following beyond a reasonable doubt: "(1) the existence of the conspiracy charged; (2) that the defendant had knowledge of the conspiracy; and (3) that the

defendant intentionally joined the conspiracy." *Santos*, 541 F.3d at 70 (internal citations omitted). "When a defendant challenges the sufficiency of the evidence in a conspiracy case, 'deference to the jury's findings is especially important … because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *Id.* (citing *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004)).

The object of the conspiracy charged in Count One was mail or wire fraud. The relevant statute on wire fraud is 18 U.S.C. § 1343, which provides, in relevant part:

> Whoever, having devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire radio or television communication in interstate or foreign commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice shall be [guilty of wire fraud].

The relevant statute on mail fraud is 18 U.S.C. § 1341 which provides, in relevant part:

> Whoever, having devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises … places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be [guilty of mail fraud].

Here, there was ample evidence that the charged mail and/or wire fraud conspiracy existed. Anderson testified that he and Duckett agreed to submit invoices provided to them from Big Span to the City that they knew were fraudulent, and then later agreed to retain the proceeds from those invoices, rather than disperse them to the subcontractors who were owed that money. [Anderson Direct Tr. 6/27/17, 94; Anderson Direct Tr. 6/28/17, 10, 18; Ex. 8A, 9C, 10B]  This

evidence permitted the jury to infer reasonably that Duckett and Anderson conspired to defraud the City and the PSMG subcontractors by obtaining their money.

"Once the existence of a conspiracy has been established, the government must prove that the person charged knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *Santos*, 541 F.3d at 71 (internal quotation marks omitted). The government must prove that the defendant had knowledge of the conspiracy charged, and intended to join it. *Id.* Here, there was sufficient evidence upon which a rational jury could have based a finding that Duckett knew of the conspiracy and intended to join it. The jury heard testimony from Rick Laxton, a sales manager at Big Span, that he or his secretary emailed from Florida three invoices to Duckett and Anderson at Duckett's request. [Laxton Direct Tr. 6/27/17, 24; *see* Ex. 8, 9, 10] The jury also heard testimony from Anderson that both he and Duckett knew that the invoices did not relate to any work Big Span had done on the Dillon Stadium project, but that Anderson and Duckett agreed to submit the invoices to the City for payment anyway along with a 5% PSMG fee. [Anderson Direct Tr. 6/27/17, 94; Anderson Direct Tr. 6/28/17, 17, 18; Ex. 8A, 9C, 10B] The jury also heard testimony from Anderson that when PSMG was paid by the City on those invoices, Duckett retained some of those funds for himself and his associates, and neither Big Span nor any of the other contractors were given the money due to them under the invoices.

Viewing that evidence in its totality, and in the light most favorable to the government, a rational jury could have found beyond a reasonable doubt that Duckett was a knowing participant in a conspiracy to commit wire fraud. The jury was free to credit Anderson's testimony, and I must defer to its credibility determinations. This is not a situation where there are "exceptional circumstances" that allow me to intrude upon the jury's role. *Sanchez*, 969 F.2d at 1413.

Accordingly, Duckett's Motion for Judgment of Acquittal as it relates to his conviction under Count 1 is **denied**.

### 2.   *Wire Fraud (Counts 8-10)*

In Counts Eight, Nine, and Ten Duckett was charged with wire fraud in violation of 18 U.S.C. § 1343 under alternative theories of liability.  He was charged with committing wire fraud himself, as a principal of the crime, and/or with aiding and abetting another person, namely Anderson, who committed wire fraud.  Under either theory of liability, the jury reasonably could have found Duckett guilty of wire fraud in all three counts.

To prove wire fraud, "the government must show (1) a scheme to defraud victims (2) by obtaining their money or property (3) furthered by the use of interstate … wires.  The government must further establish that the defendant had fraudulent intent or a conscious knowing intent to defraud, and that some harm or injury to the property rights of the victim was contemplated."  *United States v. McGinn*, 787 F.3d 116, 122 (2d Cir. 2015) (citations omitted) (internal quotation marks omitted).

The aiding and abetting statute, 18 U.S.C. § 2, provides that someone can be found guilty of aiding and abetting a crime and can be punished as a principal if he: "(a) . . . aids or abets or counsels, commands or induces, or procures [an offense's] commission" or "(b) … willfully causes an act to be done which, if directly performed by him, or another would be an offense against the United States."  To prove a defendant guilty under subsection (a), "the government must prove that the underlying crime was committed by a person other than the defendant, that the defendant knew of the crime, and that the defendant acted with the intent to contribute to the success of the underlying crime."  *United States v. Huezo*, 546 F.3d 174, 179 (2d Cir. 2008) (citations omitted) (internal quotation marks omitted), *cert. denied*, 558 U.S. 936 (2009).  In

order to prove the defendant acted with specific intent, "the government need not establish that he knew all of the details of the crime, only that he joined the venture, [that he] shared in it, and that his efforts contributed toward its success." *Id*. at 179-80 (internal quotation marks omitted).

The subjects of the wire fraud convictions are three emails sent from Big Span to Anderson and Duckett that included invoices as attachments, which Duckett and Anderson later submitted to the City for payment. The jury heard testimony from Laxton that at the time he sent Duckett and Anderson the three invoices, Big Span had only done "conceptual work" for the Dillon Stadium project and had sent the invoices to "start a conversation" about the project, and not to get paid. [Laxton Direct Tr. 6/27/17, 25-26] Laxton also testified that Big Span did not have a contract with the City, Black Diamond, or PSMG at the time the invoices were sent to Duckett. [Laxton Direct Tr. 6/27/17, 25]

The subject of Count 8 is an email from Laxton to Duckett and Anderson on July 16, 2015, which attached a $450,000 invoice for engineering work, number 2014-169-02, which Duckett requested. [Anderson Direct Tr. 6/28/17, 104-105; Ex. 8] Laxton testified that at the point he sent Duckett and Anderson that invoice, Big Span had not yet done any engineering work, but that the $450,000 represented an "assumption" of what ten percent of the engineering cost would be. [Laxton Direct Tr. 6/27/17, 30] Anderson testified that Duckett told him that the invoice was actually for work Big Span was doing for Duckett on a completely different project, unrelated to the Dillon Stadium project. [Anderson Direct Tr. 6/27/17, 94-95] Anderson testified that Duckett nonetheless requested that he submit the fraudulent invoice to the City along with legitimate subcontractor invoices, as well as the 5% PSMG fee. [Anderson Direct Tr. 6/27/17, 94; Ex. 8A] PSMG received payment from the City in the total invoice amount of $731,936.62, but Anderson did not send the $450,000 to Big Span because Duckett told him not

to.  [Anderson Direct Tr. 6/27/17, 96]    Some of the $450,000 owed to Big Span was given to

Duckett.  [Anderson Direct Tr. 6/27/17, 96]

The subject of Count 9 is an email from Laxton to Duckett and Anderson on August 18,

2015, which attached a $250,000 invoice for engineering work, number 2014-169-03, requested

by Duckett.  [Anderson Direct Tr. 6/28/17, 104-105; Ex. 9]  Again, Laxton testified that at the

point he sent Duckett and Anderson that invoice, Big Span had not yet done any engineering

work on the project and that Big Span did not expect to be paid when he submitted this invoice,

but, rather, "hoped that [Big Span] would get a contract."  [Laxton Direct Tr., 6/27/17, 34]

Anderson testified that Duckett again told him that the invoice was for work Big Span was doing

on a completely different project, unrelated to the Dillon Stadium project.  [Anderson Direct Tr.

6/28/17, 105-106]  Anderson testified that, at Duckett's request, he prepared an invoice for

$277,106 to the City that included two invoices from the architectural firm, Quisenberry Arcari

("Quinsenberry"), the $250,000 Big Span invoice, and the 5% PSMG Construction fee.

[Anderson Direct Tr. 6/28/17, 107; Ex. 9C]  Anderson sent the invoice to Duckett who then

submitted it to the City.  [Anderson Direct Tr. 6/28/17, 110; Ex. 9C]  The City paid PSMG the

full invoice amount.  [Anderson Direct Tr. 6/28/17, 111-112]

The subject of Count 10 is an email from Laxton to Duckett on September 18, 2015,

which attached a $300,000 invoice for engineering work, number 2014-169-04.  [Ex. 10]

Duckett then emailed the invoice to Anderson later that same day.  [Ex. 10A]  Again, Laxton

testified that at the time he sent that invoice to Duckett, Big Span had not undertaken any

engineering work on the project.  [Laxton Direct Tr., 6/27/17, 43]  Anderson testified that

Duckett told him to process the invoice, and Anderson included it in a $315,000 invoice to the

City, along with the 5% PSMG fee.  [Anderson Direct Tr. 6/28/17, 115; Ex. 10B]  Anderson

testified further that he gave Duckett the invoice and Duckett submitted it to the City.  [Anderson Direct Tr. 6/28/17, 117]  The City stopped payment on the check issued to pay that invoice before the check was sent to PSMG.

The jury heard testimony from Anderson that both he and Duckett knew that the invoices did not relate to any work Big Span had done on the Dillon Stadium project, but that Anderson and Duckett agreed to submit the invoices to the City for payment anyway along with a 5% PSMG fee.  [Anderson Direct Tr. 6/27/17, 94; Anderson Direct Tr. 6/28/17, 17, 18; Ex. 8A, 9C, 10B]  The jury also heard testimony that once the invoices were paid to PSMG, the money was not given to the subcontractors who had actually provided services on the Project, like Quisenberry, but, instead, was used for purposes unrelated to the Project.  That evidence reasonably supports a finding that Duckett participated in a scheme to defraud the City by wrongfully obtaining their money through use of false invoices, and a scheme to defraud the PSMG subcontractors by retaining the money rightfully owed to them.  The jury also heard evidence that Duckett and Anderson used interstate wires to further their scheme; Laxton testified that someone from Big Span emailed the invoices from Florida to Anderson and/or Duckett, who were located in Connecticut.  [Laxton Direct Tr. 6/27/17, 24; *see* Ex. 8, 9, 10]

Viewing the evidence in its totality, and in the light most favorable to the government, a rational jury could have found beyond a reasonable doubt that Duckett knowingly participated in a scheme to fraudulently obtain money from the City and fraudulently retain money owed to the subcontractors, which was furthered by his use of interstate wires, namely requesting and receiving the fraudulent invoices via email from Florida.  Accordingly, the jury reasonably could have found Duckett guilty as a principal under the wire fraud statute.  The evidence also supports a finding that Duckett was proven guilty, alternatively, under the theory that he aided and abetted

Anderson, pursuant to 18 U.S.C. § 2(a), in committing wire fraud, because there is evidence to support a finding that Duckett knew of the scheme to defraud the City and the subcontractors and "counseled", "commanded," and "induced" Anderson to carry it out by requesting that he submit the fraudulent invoices, in order to contribute to the success of the crime. *Huezo*, 546 F.3d at 179.

Accordingly, on the basis of the exhibits presented by the government, and the testimony of Laxton and Anderson, which the jury was free to credit, a rational jury could have found beyond a reasonable doubt that Duckett committed all three counts of wire fraud. Therefore, Duckett's Motion for Judgment of Acquittal as it relates to his convictions under Counts 8, 9, and 10 is **denied**.

3. *Illegal Monetary Transaction (Counts 11, 13, 14, 16, 17, 18, 22, and 23)*

Duckett was charged with nine counts[1] of illegal monetary transaction in violation of 18 U.S.C. § 1957. A person is guilty under this section if he "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and [the criminally derived property] is derived from specified unlawful activity." 18 U.S.C. § 1957(a). As used in subsection (a), the term "monetary transaction" means the "deposit, withdrawal, transfer, or exchange" of funds by, through, or to a financial institution. 18 U.S.C. § 1957(f)(1). The term "'criminally derived property' means any property constituting, or derived from, proceeds obtained from a criminal offense[.]" 18 U.S.C. § 1957(f)(2). The government is not required to prove, however, that the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity. 18 U.S.C. § 1957(c). Essentially, the government must prove that Duckett knowingly engaged in a monetary

---

[1] The jury found him not guilty of Count 21.

transaction that involved criminally derived property of a value greater than $10,000 that was derived from mail and/or wire fraud.

 The subject of Count 11 is a March 30, 2015 $200,000 check drawn from the PSMG construction account to Attorney Deron Freeman, Duckett's attorney.  The jury heard testimony from Anderson that Duckett instructed Anderson to give that money to Freeman.  [Anderson Direct Tr. 6/27/17, 49]  Anderson testified that he discussed with Duckett that PSMG did not have $200,000 of its own funds, and that money was from the City to pay the subcontractors for the work done on the project, namely Quisenberry and Fuss & O'Neill, the environmental testing company.  [Anderson Direct Tr. 6/27/17, 51-52; Anderson Direct Tr. 6/28/17, 100-101]  The jury heard further testimony that Duckett responded that "this is the way things are done in the investment world."  [Anderson Direct Tr. 6/27/17, 51-52]  Anderson testified that he wrote the check for Attorney Freeman and gave it to Duckett, and that PSMG never got that money back.  [Anderson Direct Tr. 6/27/17, 52, 54]  The jury also heard testimony from Freeman that he put that check into his client account and was directed by Anderson that the proceeds be used for Duckett's benefit.  [Freeman Direct Tr. 6/29/17, 3-4]  Freeman's records reflect that the $200,000 was dispersed in fifteen disbursements, all at Duckett's request, including $119,990 to the "Motorcar Collection," a total of $11,000 to Freeman as payments for a case he handled for Duckett, disbursements to other Duckett associates totaling $30,000, and multiple payments to Duckett totaling $39,010.  [Freeman Direct Tr. 6/29/17, 6-10; Ex. 11A]

 The subject of Count 13 is a May 19, 2015 $50,000 wire from the PSMG operating account to Moolex, a purported investment company associated with Duckett.  The jury heard testimony from Anderson that Duckett requested that PSMG send $50,000 to Moolex as "part of the [investment] process."  [Anderson Direct Tr. 6/27/17, 57]  Anderson testified that the

$50,000 to Moolex was a portion of a transaction and registration fee that would allow Duckett

to access up to $25,000,000 in funding for the project.  [Anderson Direct Tr. 6/27/17, 61-62; Ex.

13A]  Anderson testified that the $50,000 that PSMG sent to Moolex was money paid to PSMG

by the City, on the basis of an invoice, and was intended to be used as payment to Quisenberry.

[Anderson Direct Tr. 6/27/17, 58, 74]  Anderson further testified that he discussed with Duckett

that the $50,000 was intended for Quisenberry, but that Duckett told him not to worry, that the

funding from Moolex would come in and everything would be "taken care of."  [Anderson

Direct Tr. 6/27/17, 64]  The jury also had Exhibit 4H, an email chain amongst Moolex CEO Dr.

Rahul Chaturvedi, Anderson, and Duckett in which Anderson stated:  "We used the $350K to

you that was money allocated to pay the Architects and Engineers for the development of the

Stadium."  [Ex. 4H]  Anderson further testified that PSMG never received any money back from

Moolex.  [Anderson Direct Tr. 6/27/17, 58]

> The subject of Count 14 is a May 20, 2015 $40,000 transfer from the PSMG operating

account to Black Diamond.  The jury heard testimony from Anderson that Duckett requested that

Anderson send him, through Black Diamond, $40,000 as "part of the process" so that Duckett

could continue to operate Black Diamond.  [Anderson Direct Tr. 6/27/17, 78]  Anderson testified

that he told Duckett that the money in the PSMG account was from the City and was allocated to

pay the subcontractors, and Duckett responded not to worry about it, that the investment funding

from Moolex would be coming in.  [Anderson Direct Tr. 6/27/17, 78; Anderson Direct Tr.

6/28/17, 100-101]

> Given the evidence and testimony to support the allegations in Counts 11, 13, and 14, the

jury reasonably could have found that Duckett engaged in monetary transactions of over

$10,000, the proceeds of which were criminally derived from the fraud that he and Anderson

were committing by fraudulently receiving money from the City and retaining it rather than

dispersing it to the subcontractors.  The jury was free to credit Anderson's testimony that he told

Duckett that PSMG did not have money that was not allocated for legitimate uses and that

Duckett disregarded it, which satisfies the government's burden to prove that Duckett knew that

the property was derived from their continued defrauding of the subcontractors by retaining their

funds.  Accordingly, on the basis of the foregoing evidence, a rational jury could have found,

beyond a reasonable doubt, that Duckett committed the crimes as charged in Counts 11, 13, and

14.

       The remaining five counts presents a closer question.  The subjects of Counts 16, 17, 18,

22, and 23 are as follows: an August 4, 2015 $120,000 transfer from the PSMG operating

account to Black Diamond (Count Sixteen); an August 5, 2015 $40,000 transfer from Black

Diamond to Derek Edwards, an investor that Duckett knew (Count Seventeen); an August 5,

2015 $13,252.64 check from Black Diamond to Duckett (Count Eighteen); an August 26, 2015

$15,000 transfer from the PSMG operating account to Black Diamond (Count Twenty-Two); and

a September 2, 2015 $105,000 transfer from the PSMG operating account to Black Diamond

(Count Twenty-Three).  Here, unlike in Counts 11, 13, 14, there was no testimony from

Anderson that he informed Duckett that PSMG did not have sufficient unallocated funds to

afford each of these transactions.  There was testimony from both Anderson and Tom Novajasky,

another PSMG executive, that Duckett did not have access to the PSMG bank accounts and did

not do any of the banking on behalf of the company.  [Anderson Cross Tr. 6/29/17, 243-245]

The question, then, is whether the government nonetheless met its burden to prove that Duckett

had the required knowledge that the money exchanged in those transactions was criminally

derived property, meaning that it represented proceeds from unlawful activity.

14

The remaining counts pertain to five monetary transactions that occurred within a month span, between August 4, 2015 and September 2, 2015.  In late June 2015, Duckett was aware that PSMG had, until that point, received almost $380,000 from the City in legitimate invoice payments and had sent $400,000 to Moolex and Rabbi Levy, a Moolex affiliate, rather than the subcontractors who had worked on the project.  Additionally, the jury heard testimony from Novajasky that on July 15, 2015, he and others, including Anderson, had a meeting to confront Duckett and to express their concerns regarding PSMG's financial instability, and the fact that the subcontractors were not being paid.  [Novajasky Direct Tr. 6/29/17, 23]  Novajasky testified that they told Duckett that the private funding needed to come through so they could "get back on track," and Duckett told them that the "money is coming."  [Novajasky Direct Tr. 6/29/17, 23]  Additionally, the jury heard testimony that Duckett called the City around August 21, 2015 and asked if Anderson could pick up a check rather than have it mailed because the PSMG subcontracts were complaining that they were not getting paid.  [Sinani Direct Tr. 6/29/17, 4] This evidence supports a reasonable conclusion that Duckett was on notice, at the time the transactions in question were made, that the money used in the transactions was derived from the wire fraud because the subcontractors were not being paid and the money owed to them was diverted elsewhere, including to Duckett's associates.

Furthermore, Duckett was aware that during that time frame, PSMG was receiving funding from the City on the basis of the fraudulent invoices that he and Anderson submitted, which were the subjects of Counts 8, 9, and 10.  On July 16, 2015, Duckett and Anderson submitted the first of the fraudulent invoices to the City, which included the $450,000 Big Span invoice.  [Ex. 8A]  On August 18, 2015, they submitted the second of the fraudulent invoices to the City, which included the $250,000 Big Span invoice.  [Ex. 9A]  And on September 18, 2015,

they submitted the last of the fraudulent invoices to the City, which included the $300,000 Big Span invoice, though they never received those funds from the City.  [Ex. 10B]  The jury could have reasonably concluded, then, that Duckett knew in August and September that the money PSMG had was derived from these fraudulent invoices that he and Anderson submitted to the City, and funded, at least in part, the transactions at issue here.  Accordingly, there was sufficient evidence on which the jury could rely in coming to a reasonable conclusion that Duckett was aware that the money that paid the transactions at issue were criminally derived from the wire frauds that he and Anderson committed.  On the basis of the foregoing evidence, a rational jury could have found, beyond a reasonable doubt, that Duckett committed the crimes as charged in Counts 16, 17, 18, 22, and 23.

Accordingly, Duckett's Motion for Judgment of Acquittal as it relates to his convictions under Counts 11, 13, 14, 16, 17, 18, 22, and 23 is **denied**.

Duckett also argues, with respect to all counts, that the government failed to prove that he was acting in good faith, under a belief that the third-party financing from Moolex would come in and fund the project.  The jury was thoroughly instructed on the issue of good faith and rejected this theory, a conclusion I will not disturb.  *See* Jury Instructions at 25-26.  The jury reasonably could have concluded, and indeed seemingly did, that the evidence presented showed that Duckett knowingly and fraudulently took hundreds of thousands of dollars from the City and used it on himself and his associates, which negated any good faith he may have had.  Accordingly, this argument is without merit.

Duckett's Motion for Judgment of Acquittal is **denied**.

**III.     Motion for New Trial (#148)**

   A. <u>Standard</u>

     "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.  Rule 33 gives the trial court "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).  The test for determining if a new trial should be ordered remains whether "it would be a manifest injustice to let the guilty verdict stand."  *Id.* (internal quotation marks omitted).  In other words, in order to grant a new trial under Fed. R. Cr. P. 33, the court must answer "no" to the following question:  "Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?"  *Id.*

   B. <u>Discussion</u>

     1. *Bad Act Evidence*

     Duckett alleges first that he was unfairly prejudiced by the erroneous admission of bad act evidence.  He argues that the admission of testimony regarding claimed statements made by Duckett about his vocational history and/or association with the National Football League ("NFL") should not have been admitted.  He argues that this evidence is inadmissible under Federal Rules of Evidence Rule 403 and Rule 404 and that the evidence was "wholly collateral, immaterial, and meaningless" and only was used by the government to suggest that Duckett was dishonest.

     "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Relevant evidence can be excluded "if its probative value is substantially

outweighed by the danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403. Evidence of crimes, wrongs, or other acts is "not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" but "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b).  The Second Circuit, however, has noted that evidence does not fall within the purview of Rule 404(b) "if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial."  *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (citing *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)).

Here, the government offered evidence that Duckett held himself out as a member of the NFL to City officials, members of the North American Soccer League ("NASL"), and PSMG associates.  His biography, which was provided to Anderson and included in presentations to the City and NASL, provided, in part:  "[Duckett] was drafted by the Washington Redskins in the 6th round of the NFL draft.  He played a total of 5 seasons, splitting time with the Redskins and the Pittsburgh Steelers.  During his NFL tenure, [Duckett] built excellent relationships with many business contacts and started to cultivate those relationships for future endeavors."  [Ex. 4D] The government alleges that the information about his NFL affiliation was provided by Duckett during the course of the charged-conspiracy, to the intended victims of that crime and is, therefore, relevant and not subject to the Rule 404(b) prohibition.  I agree with the government that the evidence was "inextricably intertwined" with the evidence of the conspiracy to defraud the City and PSMG subcontractors and, therefore, was properly admitted.

Duckett argues further that the government did not explain how it planned to use the evidence during trial, and did not allege how the evidence was material, made in furtherance of the conspiracy, or relied upon by any person or entity.  It seems to me, however, that Duckett is mistakenly placing an affirmative duty of disclosure on the government pursuant to Fed. R. Evid. 404(b)(2) which provides:  "*On request by a defendant in a criminal case, the prosecutor must*: (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and (B) do so before  trial. . . ."  (Emphasis added).  Duckett does not allege that the government refused to comply with this rule *after he requested such information*, rather, he seems to be arguing that the government should have affirmatively provided him with the information, which is not a correct reading of the rule.  Accordingly, to the extent Duckett's argument relies upon the government failing to provide notice of the intent to use of the evidence, his claim must fail.

Furthermore, even if the evidence was erroneously admitted, it is not clear to me that the evidence played any substantial role in the jury's determination to convict Duckett, and, therefore, that Duckett suffered any harm by its admission.  Throughout the five days of evidence, the jury heard relatively little about Duckett's statements regarding his purported association with the NFL, and heard overwhelming evidence about his scheme to defraud the City and PSMG's subcontractors by submitting invoices, both fraudulent and legitimate, to the City and retaining the money for himself and his associates.  *See* Section II of this opinion.  It seems to me that his possible NFL career, the nature of which is, frankly, still unclear, and his statements about his NFL association played little role in the overall financial scheme, and the evidence of his purported investment connections through other means was far more overwhelming and conclusive.

Accordingly, I do not see how Duckett has suffered a "manifest injustice," requiring a new trial. His motion for a new trial on the grounds that the evidence of his statements about the NFL should not have been admitted is, therefore, **denied.**

    2.  *Jury Instructions*

Duckett next alleges he was prejudiced by a portion of the jury charge that erroneously broadened the government's theory of criminal liability and, therefore, that he is entitled to a new trial. "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Rowland*, 826 F.3d 100, 115 (2d Cir. 2016) (citations omitted) (internal quotations omitted).

As part of my charge to the jury regarding wire fraud, I instructed:

The first element the government must prove beyond a reasonable doubt is that there was a scheme or artifice to defraud or to obtain money or property by means of materially false or fraudulent pretenses, representations or promises.

. . .

A scheme to defraud is any plan, device, or course of action to obtain money or property by means of false or fraudulent pretenses, representations or promises reasonably calculated to deceive persons of average prudence.

"Fraud" is a general term that embraces all the various means by which human ingenuity can devise and which are resorted to by an individual to gain an advantage over another by false representations, suggestions or suppression of the truth, or deliberate disregard for the truth.

Thus, a "scheme to defraud" is merely a plan to deprive another of money or property by trick, deceit, deception, or swindle.

The scheme to defraud is alleged to have been carried out by making false or fraudulent statements, representations, claims, or documents.

…

In addition to proving that a statement was false and fraudulent and related to a material fact, in order to establish a scheme to defraud, the government must prove that the alleged scheme contemplated depriving another of money or property. A deprivation of

> property can include *depriving another of information necessary to make discretionary economic decisions*.

Jury Instructions, 22-24 (emphasis added).  Duckett argues that the last sentence of that charge was erroneously given as it expanded the government's theory of liability and was beyond the scope of the allegations contained in the indictment.  It may be that the plain error review governs here.[2]

Duckett argues that a "right to control" theory was not set forth by the government in the indictment and, therefore, is beyond the scope of the allegations against him.  This argument is unavailing, however, because the right to control theory encapsulated by the language regarding the deprivation of information necessary to make discretionary economic decisions, is a component of every wire and mail fraud allegation, whether implicitly or explicitly alleged.  As stated by the Second Circuit:

> To sustain a conviction for wire fraud under 18 U.S.C. § 1343 . . . and conspiracy to commit such wire fraud, the government must prove that the defendant acted with specific intent to obtain money or property by means of a fraudulent scheme that contemplated harm to the property interests of the victim.  While the interests protected by the mail and wire fraud statutes do not generally extend to intangible rights . . . they do extend to all kinds of property interests, both tangible and intangible.  Since a defining feature of most property is the right to control the asset in question, we have recognized that the property interests protected by the statutes include the interests of a victim in controlling his or her own assets.

---

[2] "Plain error review applies … where the defendant did not object before the trial court because he failed to recognize an error."  *United States v. Vilar*, 729 F.3d 62, 70 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2684 (2014).  Under plain error review, "relief is not warranted unless there has been (1) error, (2) that is plain, and (3) affects substantial rights."  *Jones v. United States*, 527 U.S. 373, 389 (1999).  Here, Duckett's attorneys objected at the charge conference to the language of the draft jury charge that provided, in relevant part:  "Such a contemplated deprivation *of money or* property can include depriving another of information necessary to make discretionary economic decisions."  Draft Jury Charge at 24 (emphasis added).  [Charge Conference Tr. 7/5/17, 10-11]  After a discussion, I decided to delete the language that provided that monetary deprivation could also include deprivation of information necessary to make discretionary economic decisions, and charge the jury that such a deprivation of information relates only to a deprivation of property.  [Charge Conference Tr. 7/15/17, 15-16]  Duckett's attorney stated that he was fine with that change.  [Charge Conference Tr. 7/5/17, 15-16]  This may be a situation in which plain error would apply, then, because Duckett may not have sufficiently objected to the final language in this section of the Jury Instructions.  Nonetheless, whether or not plain error review does apply here, there was no error in the instructions.

*United States v. Carlo*, 507 F.3d 799, 801-02 (2d Cir. 2007) (citations omitted) (footnote omitted).  By virtue of charging Duckett with wire fraud and conspiracy to commit wire and/or mail fraud, the government put Duckett on notice of the allegation that he withheld financial information from his victims, depriving them of the right to control their own assets. Accordingly, the government was under no obligation to affirmatively state in the indictment that it alleged as part of its charge of wire fraud and/or conspiracy to commit wire or mail fraud that Duckett withheld financial information from his victims.  The instruction, therefore, was legally correct and adequately informed the jury of the law.

Furthermore, even if the jury instruction was erroneously given, it is not clear to me that the inclusion of this one sentence in a lengthy instruction harmed Duckett in any way.  In light of the overwhelming evidence that Duckett's alleged scheme "contemplated depriving another of *money*," the jury did not even have to address whether the alleged scheme contemplated the deprivation of property; a finding that he contemplated depriving another of money was sufficient to satisfy the element.  Furthermore, even if the jury did turn to the question of deprivation of property, "information necessary to make discretionary economic decisions" is only one example of a type of property deprivation upon which the jury could have relied.  In other words, there were many other ways, beyond the deprivation of information, that the jury could have found that the government satisfied its burden with respect to the element.  In light of the evidence against him that supports the jury's verdict regardless of whether this instruction was included, I cannot see how Duckett suffered any prejudice by its inclusion.

Accordingly, Duckett has not suffered a "manifest injustice," requiring a new trial.  His motion for a new trial on the grounds that this instruction should not have been admitted is, therefore, **denied.**

**IV.    Conclusion**

Duckett's Motion for Judgment of Acquittal (**doc. # 147**) is **DENIED** and his Motion for New Trial (**doc. # 148**) is **DENIED**.

So ordered.

Dated at Bridgeport, Connecticut, this 4th day of December 2017.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge